Randolph Gaw (S.B. #223718)
rgaw@gawpoe.com
Christopher Wimmer (SB #263275)
cwimmer@gawpoe.com
Victor Meng (S.B. #254102)
vmeng@gawpoe.com
GAW | POE LLP
One Embarcadero, Suite 1200
San Francisco, CA 94111
Telephone: (415) 766-7451
Facsimile: (415) 737-0642

Attorneys for Plaintiff
ARIONIX INC.

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ARIONIX INC., a Delaware corporation,<br><br>Plaintiff,<br><br>v.<br><br>WEXA, INC., a Delaware corporation, and NAGA KIRAN PASAVEDALA, an individual.<br><br>Defendants. | Case No. 3:26-CV-8060<br><br>**VERIFIED COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Arionix Inc. ("Arionix") hereby makes the following allegations against defendants Wexa, Inc. ("Wexa") and Naga Kiran Pasavedala ("Kiran") (collectively, the "Defendants"):

**NATURE OF THIS ACTION**

1. Arionix hired Wexa, Inc. to build software in furtherance of Arionix's new technology—a self-organizing, autonomous context graph ("SOAC").

2. Arionix defined the technology, set the requirements, supplied the required confidential information to Wexa, and paid every invoice Wexa issued.

3. Kiran, who is Wexa's co-founder and Chief Executive Officer, confirmed the arrangement in writing, stating that "Arionix will dictate on the agreed deliverables, engineering solution, timelines and business outcomes for which Wexa is being engaged and compensated." He described the engagement precisely: a paid vendor relationship.

4. When the engagement ended in July 2026, Arionix asked three times in writing for the source code it had paid for. Wexa never delivered it. To this day Arionix does not have a copy of the software built to its specification and at its expense.

5. Instead, on July 19, 2026, Kiran filed two provisional patent applications with the United States Patent and Trademark Office claiming as his own invention the same technology Arionix had specified and paid Wexa to build. Kiran did so despite the parties' written understanding that Arionix "owns exclusive rights" to the technology, that patent filings "will be done only by" Arionix, and that Wexa would "have no claim" in them.

6. Additionally, two days after Kiran filed the provisional patent applications, Wexa sued Arionix and its principals in India, claiming that the SOAC technology it programmed for Arionix was actually Wexa's intellectual property. The courts of India, however, lack jurisdiction to adjudicate a dispute between American companies, or over American provisional patent applications, or over a contract requiring the application of New Jersey law.

7. Arionix brings this action to recover its property, to stop the further use and disclosure of its confidential information, and to establish that the inventions that Wexa and Kiran have attempted to claim belong solely to Arionix.

## PARTIES

8. Plaintiff Arionix Inc. is a corporation organized under the laws of the State of Delaware, with a place of business at 1100 Cornwall Road, Suite 136, Monmouth Junction, New Jersey 08852.

9. Defendant Wexa, Inc. is a corporation organized under the laws of the State of Delaware, with its principal place of business in San Francisco, California.

10. Defendant Naga Kiran Pasavedala[1] is the co-founder and Chief Executive Officer of Wexa. He executed the Master Services Agreement on Wexa's behalf, negotiated and directed Wexa's performance, received the confidential information at issue, refused to deliver Arionix's work product, and filed the provisional patent applications described below in his own name as the first named inventor. Kiran has told Arionix's owners on multiple occasions that he frequently travels to and resides in San Francisco for extended periods for the purpose of conducting Wexa's business, and did so during the period relevant to this Complaint.

## JURISDICTION AND VENUE

11. This Court has federal question subject matter jurisdiction over the First Cause of Action under 28 U.S.C. sections 1331 and 1338(a) and 18 U.S.C. section 1836(c), because it arises under the Defend Trade Secrets Act of 2016, 18 U.S.C. section 1836, et seq. It also has subject matter jurisdiction over the Sixth Cause of Action under 28 U.S.C. section 1331 and 18 U.S.C. section 1121 because it arises under the Lanham Act.

12. This Court has supplemental jurisdiction over the remaining causes of action under 28 U.S.C. section 1367(a), because they are so related to the First Cause of Action that they form part of the same case or controversy under Article III of the United States Constitution. All of Arionix's claims arise from the same engagement, the same disclosures of confidential information, and the same refusal to deliver the work product Arionix commissioned and paid for.

---

[1] Kiran identifies himself solely as "Kiran Pasavedala" in all documents and correspondence he had exchanged with Arionix, but in his Indian court filings and his provisional patent applications, he identifies himself as Naga Kiran Pasavedala.

13. If Wexa is to deny that its principal place of business is in San Francisco, it should be estopped from making that denial. Wexa has repeatedly made that representation to Arionix in written correspondence and in a contract, and Arionix and others relied upon that representation in transacting with Wexa. Moreover, Wexa has alleged in its judicial proceedings in India that its principal place of business is in San Francisco. Wexa cannot invoke a California identity to obtain benefits for itself and then disclaim that identity to avoid answering for its breach. Finally, it should be noted that Wexa's other co-founder is domiciled in San Francisco and she works on Wexa matters from that location.

14. This Court has personal jurisdiction over Wexa and Kiran because Defendants purposefully availed themselves of the benefits and protections of California law by presenting Wexa as a California enterprise in the contract at issue, in the parties' correspondence throughout the engagement, and on its website; by transacting the business at issue through, and directing communications, deliverables and invoices to and from, San Francisco; and by receiving Arionix's confidential information there. Wexa's own confidentiality and intellectual property agreements with the personnel who performed this work likewise identify Wexa as a San Francisco company and are expressly governed by California law.

15. Venue in this Court is proper because a substantial part of the events giving rise to Arionix's claims occurred in this District under 28 U.S.C. section 1391(b)(2): Wexa has represented its principal place of business to be in this District, the contract sued upon identifies this District as Wexa's place of business, the contract was made and to be performed in substantial part here, Arionix's confidential information was transmitted to and received at that address, and the obligations sued upon arose here.

16. Venue is also proper as to Kiran under 28 U.S.C. section 1391(c)(3), because he is not a resident of the United States and may be sued in any judicial district.

**INTRADISTRICT ASSIGNMENT**

17. Assignment to the San Francisco Division is proper under Civil Local Rule 3-2(c) and (d).

## FACTUAL ALLEGATIONS

18. The allegations made in this verified complaint are made on the personal knowledge of Deepali Sontakke ("Deepali"). Deepali is one of the two co-founders of Arionix and she is also the CEO of a full stack information technology company called Precision Technologies Corp. ("PTC"), which as part of its business, contracts with software professionals for various software development services. Moreover, Deepali is an investor in Wexa through a separate limited liability company and was personally sued, along with Arionix and others, in the India litigation by Wexa.

19. Arionix's other co-founder is a man named Sreedhar Narayanan ("Sreedhar"). He is the person who conceived of the SOAC.

### *A. The Arionix Platform*

20. Generative AI large language model software like ChatGPT, Claude, Gemini, and so forth operate by using what are called "context windows." A context window is what the LLM uses to generate text in response to a user's query. The user uploads files, or otherwise types in information, to build the context window for the query the user puts to the LLM.

21. The data within a context window is unstructured by itself. Thus, the LLM ordinarily has no way to understand the relationships between the different pieces of information provided by the user.

22. A "context graph" is what is used by the LLM to model the relationships. It is a way of structuring discrete information in the context window by presenting "nodes" of information and "edges" representing the relationships between those nodes. Visually, the "graph" of a context graph represents the knowledge that an LLM will access when making inferences in response to a user's query.

23. For example, if a user uploads a newspaper article, the context graph provides the LLM with information about how old the article is, who authored it, and how individuals mentioned in that article are related to one another. This structure provides the LLM information to use when generating its inferences and resulting responses to the user's query.

24. Thus, the concept and use of context graphs is well known to people developing software based on, or otherwise using, LLMs. The SOAC is a novel idea that Sreedhar conceived that alters how existing context graphs operate. The details of how the SOAC operates is itself highly confidential, and so Arionix cannot provide further details in this public filing.

25. Along with a woman named Deepali, Sreedhar co-founded Arionix to develop the SOAC.

**B. *Introduction to Wexa***

26. In June 2025, Deepali was introduced to Kiran in connection with a potential investment into Wexa.

27. Wexa is a company that advertised its ability to build "AI Coworkers" for its clients. That is, Wexa would use LLM software to provide "virtual assistants" for users. Those virtual assistants could independently perform various tasks for the user, thereby freeing up the user from having to engage in repetitive or time-consuming activities.

28. Wexa had nothing to do with the use or development of context graphs. Wexa was simply one of the many new AI startups that leverage the capabilities of LLMs.

29. Kiran's pitch to Deepali would be that PTC could provide Wexa's AI co-working solutions to PTC's clients under what is essentially a white label agreement. Intrigued by Wexa's potential, Deepali and another co-investor ultimately invested $250,000 into Wexa via a separate limited liability company.

30. In early 2026, Deepali met Sreedhar. They decided to form a venture to build out the SOAC concept as a standalone platform company. At the time, the trade name of this planned venture was Soak.ai. The venture's name was later changed to Arionix—the divine horse in Greek mythology that ran faster than the wind.

31. Through Deepali, Sreedhar met Kiran. Deepali and Sreedhar invited Kiran to participate in Soak.ai / Arionix as a co-founder and Chief Technology Officer. Kiran declined as he wanted to focus his attention on Wexa instead.

32. Wanting to generate revenue for Wexa, however, Kiran offered to have Wexa provide contract software development services to build out a proof of concept / prototype for the SOAC.

33. Arionix agreed to this arrangement, as described herein.

***C. Wexa Obtains Access to Arionix's Trade Secrets***

34. In March 2026, the parties negotiated the framework for the platform build. On March 14, 2026, Sreedhar sent a proposed operating agreement to Kiran, copying Deepali, explaining that it was drafted to address Wexa's need for revenue and its need to operate without continually raising funds, and to "compensate you for building Soak.ai."

35. The Operating Structure and Revenue Sharing Model attachment expressly stated the parties' understanding of their respective rights. It provided that Soak.ai would hold exclusive rights in the two lifecycles; that Wexa would not compete there; and that patent filings in the two lifecycles would be made by Soak.ai alone and that Wexa "will have no claim for the two lifecycles." It also set out the Wexa personnel's billing rates.

36. As Arionix had not yet finished all matters regarding its corporate formation, and since PTC was a long-established company, on an Effective Date of April 17, 2026, Arionix and PTC entered into a Master Services Agreement ("MSA") with Wexa whereby Wexa would provide contract software development services for Arionix's benefit. A true and correct copy of the MSA, partially redacted, is attached hereto as **Exhibit A**. Kiran executed this contract on Wexa's behalf. The rate card at Section 4 of the MSA is the same rate card from the Operating Structure and Revenue Sharing Model.

37. The MSA provides, among other things, that:

a. Wexa shall provide qualified personnel and consultants based on resource requirements communicated by Precision (§§ 1, 2.1);

b. PTC shall own all deliverables, code, documentation, developments and work product specifically created by Wexa, and Wexa retains ownership only of its ***pre-existing*** tools, methodologies, know-how and intellectual property (§ 5);

c. each party shall maintain the confidentiality of all non-public, proprietary, technical, financial or confidential information received from the other, shall use it solely for purposes of the Agreement, and shall not disclose it to third parties, those obligations surviving termination for three years (§ 6); and

d. The MSA is governed by New Jersey law. (PTC is based in New Jersey.)

38. By written assignment dated August 3, 2026, Precision assigned to Arionix all of its right, title and interest in and to the MSA, together with all claims and causes of action arising out of or relating to it, whether accrued or hereafter accruing. Accordingly, Arionix is the real party in interest as to the Fourth Cause of Action for Breach of Contract.

39. Wexa performed the engagement and invoiced Arionix, not PTC, directly for it, as shown in the following table:

| Date | Invoice | Amount | For |
|---|---|---|---|
| May 25, 2026 | INV-24 | $33,964.00 | Southwest Airlines proof of concept |
| May 25, 2026 | INV-25 | $11,648.00 | 7-Eleven proof of concept |
| May 26, 2026 | INV-26 | $19,668.00 | May 2026 software resources and services |
| June 17, 2026 | INV-31 | $17,225.96 | May-June 2026 software resources and services |
| | Total Paid | $82,505.96 | |

40. Each invoice was paid in full. (On July 10, 2026, Wexa issued a new invoice—Invoice No. INV-33—after disputes arose between Arionix and Wexa.)

41. Throughout the engagement, Arionix disclosed to Defendants its trade secrets and other confidential information necessary for performance of the SOAC for the sole purpose of the build. Arionix did not authorize Defendants to use that information for any other purpose, to disclose it, to develop a competing product with it, or to claim it as their own.

42. Arionix provided Defendants with access to their proprietary technical information regarding the SOAC. This included how Arionix would divide its platform into components, what each was to do, how each would pass work to one another, and so forth.

43. Arionix also provided Defendants with the system architecture and rules for how Arionix's platform would autonomously work, as well as the specifications for the source code that Wexa would develop. Arionix also provided Defendants with its internal pricing and fee models, its cost and staffing structures for delivering the platform to clients, its plans for which customer segments and uses it would pursue first,

44. Each trade secret described above derives independent economic value, actual and potential, from not being generally known to and not readily ascertainable by proper means by others who could obtain value from its disclosure or use.

45. The trade secrets describe above relate to a product and service used in, and intended for use in, interstate and foreign commerce: the Arionix platform is designed, marketed, and licensed to enterprise customers across the United States, the engagement was performed across state and national lines between New Jersey, California, and India, and Arionix has pursued and continues to pursue enterprise customers in multiple States.

46. Arionix took reasonable measures to preserve secrecy. It limited disclosure to those with a need to know and conditioned disclosure on the confidentiality obligations in Section 6 of the MSA. Arionix disclosed these trade secrets to Wexa only for the purpose of the build and only to the personnel assigned to it. Arionix did not publish or disclose the trade secrets, or make them available to anyone outside the engagement.

47. On May 25, 2026, Kiran confirmed the parties' respective positions in writing: that Arionix and Wexa were separate businesses; that Wexa would manage its own personnel, payroll and internal processes; and that Arionix "will dictate on the agreed deliverables, engineering solution, timelines and business outcomes for which Wexa is being engaged and compensated."

48. In the same message Kiran described the work as "[t]he SDLC/STLC project shared by Arionix," which he had "discussed, evaluated and mutually agreed upon as a business opportunity that would add value and revenue to Wexa."

### *D. Wexa Misappropriates Arionix's Trade Secrets*

49. The reader will note that Wexa's first invoice was for building a proof of concept of the SOAC for Southwest Airlines as a potential client. Arionix presented this proof of concept to Southwest Airlines and received a very favorable reception.

50. From that point, Defendants' tune and actions towards Arionix completely changed. They realized that the SOAC was a highly valuable business opportunity given the positive remarks provided by Southwest's employees.

51. Defendants also had tremendous leverage over Arionix because Defendants had sole possession of the SOAC's source code and other technical deliverables (e.g., the working files and the demonstration version built for the Southwest Airlines presentation) that PTC/Arionix had contracted Wexa to build under the MSA.

52. Beginning on July 13, 2026, Arionix requested Wexa to hand over the SOAC's source code and other technical deliverables, on three separate occasions. To date, Wexa has not done so.

53. Instead, on July 19, 2026, Kiran secretly filed two provisional patent applications with the United States Patent and Trademark Office—applications 64/114837 and 64/114859. The title of invention given by Kiran make it clear that this is technology relating to the SOAC.

54. Accordingly, an actual and present controversy exists between Arionix and Defendants as to the ownership of the inventions disclosed in those provisional patent applications and of all patent rights arising from or claiming priority to them.

55. Also on July 21, 2026, Wexa initiated court proceedings in India, asserting ownership of technology against Arionix's principals and affiliates. The technology, and other contextual facts, described in this court filing are for the trade secrets conveyed by Arionix to Wexa.

//

//

//

56. Wexa has also pivoted its own business onto the context graph concept Arionix paid it to help build for Arionix. Wexa's website (as of March 2026) offered to "[a]utomate your productivity with AI Coworkers," and invited visitors to "[h]ire your AI Coworkers."







57. But in June 2026, Wexa changed its website to described itself as "[t]he World's Fastest Context Governance Platform," organized into "10 governed layers," and providing "[o]ne Wexa context plane for every agent and model" built on "[o]ne shared graph."









58. Wexa apparently forgot to update its LinkedIn page, however, as it continues to describe the earlier co-worker product as of August 3, 2026:

> **Overview**
>
> Wexa is an AI-first enterprise automation platform designed to revolutionize organizational productivity. By leveraging agentic automation and virtual coworkers, Wexa empowers your workforce to automate any imaginable business process, ensuring seamless and consistent execution.

59. Prior to Defendants' underhanded misappropriation of Arionix's trade secrets, the parties had understood their businesses to be complementary rather than competing. As Deepali wrote to Wexa's founders on July 11, 2026, "[w]ith Arionix in the enterprise space and Wexa in personal productivity, we thought the two could coexist well."

***E. Harm to Arionix***

60. As a direct and proximate result of Defendants' conduct, Arionix has been damaged, including by the loss of the sums paid for work product never delivered, the cost of recreating the withheld software, delay in bringing its platform to market, lost business and customer opportunities, and the impairment of its rights in its own technology.

61. Defendants have been unjustly enriched by their retention and use of Arionix's Trade Secrets and work product.

**<u>FIRST CAUSE OF ACTION</u>**

**(Trade Secret Misappropriation – DTSA – All Defendants)**

62. Arionix hereby re-incorporates and re-alleges all the preceding paragraphs as if fully set forth herein.

63. The confidential, proprietary information described above are trade secrets within the meaning of 18 U.S.C. section 1839(3). Arionix has taken reasonable measures to keep this information secret, and they derive independent economic value, actual and potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from their disclosure or use.

64. Arionix's trade secrets are related to products and services used in, and intended for use in, interstate and foreign commerce.

65. Arionix owns these trade secrets. Arionix conceived of them, developed them at its own expense, and paid Wexa to build them.

66. Defendants misappropriated the trade secrets by disclosing and using them without Arionix's express or implied consent, when Defendants knew or had reason to know that their knowledge of the trade secrets was acquired under circumstances giving rise to a duty to maintain their secrecy and limit their use.

67. As alleged in further detail above, Defendants' misappropriation include their retention and continued use of Arionix's source code, working files, demonstration versions, and technical documentation despite three written demands for their return, and their use of the trade secrets in Wexa's own competing offering.

68. Defendants' use and disclosure of Arionix's trade secrets is continuing.

69. As a direct and proximate result of Defendants' misappropriation, Arionix has sustained actual loss and Defendants have been unjustly enriched by amounts not accounted for in computing that loss, in amounts to be proven at trial.

70. In the alternative, Arionix is entitled to a reasonable royalty for Defendants' unauthorized disclosure and use of the Trade Secrets under 18 U.S.C. section 1836(b)(3)(B)(ii).

71. Defendants' misappropriation was willful and malicious, entitling Arionix to exemplary damages under 18 U.S.C. section 1836(b)(3)(C) and to attorneys' fees under 18 U.S.C. section 1836(b)(3)(D).

72. Arionix is entitled to injunctive relief under 18 U.S.C. section 1836(b)(3)(A), including an order restraining Defendants from any further actual or threatened misappropriation and an order requiring Defendants to deliver up, return and destroy all materials embodying the trade secrets. Such relief would also require conveyance of Kiran's ownership of the provisional patent applications.

**SECOND CAUSE OF ACTION**

**(Breach of Confidence – All Defendants)**

73. Arionix hereby re-incorporates and re-alleges all the preceding paragraphs as if fully set forth herein.

74. Arionix pleads this cause of action in the alternative to the First Cause of Action and, to the extent required by Civil Code section 3426.7, is limited to confidential information Arionix conveyed to Defendants that does not constitute a trade secret under Civil Code section 3426.1(d) (the "Confidential Information"), including Arionix's non-public business plans and commercial strategy, its customer identities and pipeline, its fee and pricing arrangements, and its internal staffing and personnel information.

75. Arionix conveyed the Confidential Information to Defendants. It was novel to Defendants and not otherwise available to them.

76. Defendants knew the Confidential Information was conveyed in confidence. Wexa had executed Section 6 of the MSA; Defendants received the information for stated and limited purposes; and Defendants were engaged as a paid vendor working on Arionix's product at Arionix's direction, as Kiran acknowledged in writing on May 25, 2026.

77. There was an understanding between the parties, express and implied from their course of conduct, that the confidence would be maintained and the Confidential Information used solely for Arionix's benefit and the purposes of the engagement.

78. Defendants disclosed and used the Confidential Information in violation of that understanding, including for their own competitive benefit, by incorporating it into patent applications filed in Kiran's own name, and by asserting it as their own property.

79. As a direct and proximate result Arionix has been damaged in an amount to be proven at trial.

80. Defendants' conduct was oppressive, fraudulent and malicious, thereby entitling Arionix to punitive damages.

**THIRD CAUSE OF ACTION**

**(Breach of Contract: Against Defendant Wexa, Inc.)**

81. Arionix hereby re-incorporates and re-alleges all the preceding paragraphs as if fully set forth herein.

82. The MSA is a valid and enforceable written contract, governed by New Jersey law under Section 11. Arionix is Precision's assignee and the real party in interest.

83. In the alternative, Arionix is an intended third-party beneficiary of the MSA: PTC entered into the MSA for Arionix's benefit and at Arionix's direction, at a time when Arionix's corporate formation was not complete; the services were performed for Arionix; and Wexa invoiced Arionix directly for them.

84. PTC/Arionix performed all conditions, covenants and promises required of them, or were excused by Wexa's own conduct. Every invoice Wexa issued for the engagement prior to this dispute was paid in full. Arionix made those payments on PTC's behalf, and Wexa accepted them in full satisfaction of the amounts due for the work.

85. Wexa breached the MSA in at least the following respects:

a. by failing to deliver the deliverables, code, documentation, developments and work product created under the engagement and paid for in full, and by retaining the only copy of the source code despite Arionix's written demands on July 13, July 14 and July 15, 2026, in breach of Sections 1, 2.1, 5, and 6;

b. by asserting ownership over work product that by the express terms of that Section belongs to Precision and now to Arionix as its assignee, in breach of Section 5;

c. by using Arionix's non-public, proprietary, and technical information for purposes other than performance, and by disclosing that information to third parties, without authorization and without equivalent confidentiality protection, in breach of Section 6; and

86. Wexa also breached the implied covenant of good faith and fair dealing by withholding the work product in order to appropriate for itself the benefit of the engagement.

87. PTC/Arionix seeks specific performance of Section 5 of the Agreement, requiring Wexa to convey full ownership of "all deliverables, code, documentation, developments, and

work product" that it created for PTC/Arionix regarding the SOAC. Section 5 would similarly require conveyance of Kiran's ownership of the provisional patent applications.

88. In the alternative, if injunctive relief is not available, Arionix has been damaged by Wexa's breach of the MSA in an amount to be proven at trial, including the amounts paid for undelivered work product, the cost of recreating it, and the value of the rights Wexa has wrongfully asserted.

**FOURTH CAUSE OF ACTION**

**(Declaratory Relief and Imposition of Constructive Trust – All Defendants)**

89. Arionix hereby re-incorporates and re-alleges all the preceding paragraphs as if fully set forth herein.

90. An actual controversy exists between Arionix and Defendants concerning their respective rights in the inventions disclosed in United States Provisional Patent Application Nos. 64/114,837 and 64/114,859 and in any applications or patents claiming priority to or derived from them (the "Applications").

91. Arionix contends that it specified the subject matter disclosed in the Applications; that any contribution by Defendants was made in the course of an engagement Arionix directed and paid for; that under Section 5 of the MSA the resulting work product belongs to Arionix as Precision's assignee, or in the alternative belongs to Arionix under its own agreement with Wexa; that independently of the MSA, and under the parties' express operating framework and their course of dealing consistent with it, patent filings in the two lifecycles were to be made by Arionix and Wexa was to have no claim in them; and that Arionix is therefore the owner of the inventions and all rights arising from the Applications. Defendants contend to the contrary.

92. Arionix seeks a declaration of the parties' respective rights and specifically that Arionix owns the inventions disclosed in the Applications and all patent rights arising from or claiming priority to them. Such a declaration is necessary now so that the parties may ascertain their rights before the twelve-month period for converting or claiming priority to the Applications expires on July 19, 2027.

93. Defendants hold the Applications and any rights arising from them by virtue of the wrongful acquisition and use of Arionix's confidential information and work product, and therefore hold them as involuntary trustees for Arionix's benefit under Civil Code sections 2223 and 2224.

94. Arionix is entitled to a constructive trust over the Applications and all rights arising from them, to an order compelling Defendants to execute all documents necessary to assign those rights to Arionix, and to an injunction restraining Defendants from converting, publishing, abandoning, assigning, encumbering or otherwise disposing of the Applications pending judgment.

**FIFTH CAUSE OF ACTION**

**(Breach of Implied-in-Fact Contract: Against Defendant Wexa, Inc.)**

95. Arionix hereby re-incorporates and re-alleges all the preceding paragraphs as if fully set forth herein.

96. Arionix pleads this cause of action in the alternative to the Third Cause of Action.

97. By their conduct, Arionix and Wexa entered into a contract whose existence and terms are manifested by that conduct. Arionix directed the work, defined the deliverables and timelines, and supplied the confidential information the work required. Wexa performed the work, deployed its personnel to it, invoiced Arionix directly for it at agreed rates, and accepted Arionix's payment. The parties understood, and Kiran confirmed in writing on May 25, 2026, that Arionix would "dictate on the agreed deliverables, engineering solution, timelines and business outcomes for which Wexa is being engaged and compensated."

98. As implied from the parties' conduct and from the nature of the engagement, the contract required Wexa to deliver to Arionix the work product Arionix had commissioned and paid for, and provided that the work product would belong to Arionix.

99. Arionix performed all of its obligations under that contract, including payment in full of every invoice Wexa issued, totaling $82,505.96.

100. Wexa breached that contract by failing and refusing to deliver the source code, working files, demonstration versions, and technical documentation created for Arionix, despite

Arionix's written demands on July 13, July 14 and July 15, 2026, and asserting ownership over that work product.

101. As a direct and proximate result, Arionix has been damaged in an amount to be proven at trial, including the amounts it paid for work product it never received and the cost of recreating that work product.

102. In the alternative, and to the extent no contract is found, Arionix is entitled to restitution. Arionix conferred a benefit on Wexa by paying $82,505.96 for work product Wexa never delivered. Wexa knowingly accepted and retained that benefit, including any profits Wexa gains by monetizing that work product, and it would be unjust for Wexa to retain it.

103. Arionix pleads the Third and Fifth Causes of Action in the alternative and does not seek duplicative recovery of the same sums under both.

## SIXTH CAUSE OF ACTION

**(Lanham Act: Against Defendant Wexa, Inc.)**

104. Arionix hereby re-incorporates and re-alleges all the preceding paragraphs as if fully set forth herein.

105. Wexa's website is presently describing its business as "The World's Fastest Context Governance Platform." That, and the other text on its website describe a business idea that originated with, and belongs solely to Arionix.

106. Indeed, nothing about Wexa's business has anything to do with a context graph. As part of its effort to wholly co-opt Arionix's trade secrets, Wexa is essentially passing off Arionix's business as its own.

107. Wexa's actions give rise to a false advertising claim under the federal Lanham Act. Arionix has been damaged by such deception, and seeks injunctive relief requiring Wexa to desist in describing its business as a "context governance platform" or having anything to do with context graphs.

108. Arionix is entitled to attorney's fees under the Lanham Act as this is an exceptional case. Wexa's deliberately tried to advertise to clients that it performs a service that it does not have any right to perform, as those ownership rights belong solely to Arionix.

**PRAYER**

**WHEREFORE**, Plaintiff Arionix Inc. prays for judgment against defendants Wexa, Inc. and Naga Kiran Pasavedala as follows:

1. For a preliminary and permanent injunction restraining Defendants and all persons acting in concert with them from using, disclosing, reproducing, modifying, adapting, commercializing or claiming any right in Arionix's trade secrets, confidential information, platform design, specifications, work product and source code, including but not limited to Wexa building a variation of Arionix's SOAC platform for its own uses;

2. For a preliminary and permanent injunction compelling Defendants to deliver to Arionix all source code, working files, configurations, documentation, proofs of concept and work product created under the engagement, and thereafter to return or permanently destroy all remaining copies, and certify compliance under oath;

3. For a preliminary and permanent injunction restraining Defendants from advertising, in any fashion, that it provides a "context governance platform" or that its business has anything to do with a context graph, and from otherwise from holding out, using, marketing, selling, or otherwise advertising Arionix's SOAC platform as being an offering from Wexa; and certify compliance under oath;

4. For a declaration that Arionix owns the inventions disclosed in United States Provisional Patent Application Nos. 64/114,837 and 64/114,859 and all patent rights arising from or claiming priority to them;

5. For the imposition of a constructive trust over those Applications and all rights arising from them, and an order compelling Defendants to execute all documents necessary to assign those rights to Arionix;

6. For an accounting of all gains, profits and benefits derived by Defendants from their use of Arionix's trade secrets, confidential information and work product;

7. For compensatory damages according to proof;

8. For restitution and disgorgement of Defendants' unjust enrichment;

9. In the alternative, for a reasonable royalty under 18 U.S.C. section 1836(b)(3)(B)(ii);

10. For exemplary damages under 18 U.S.C. section 1836(b)(3)(C);

11. For attorneys' fees under 18 U.S.C. section 1836(b)(3)(D) and as permitted by law;

12. For prejudgment and post-judgment interest as permitted by law;

13. For costs of suit incurred herein; and

14. For such other and further relief this Court deems just and proper.

Dated: August 4, 2026

GAW | POE LLP

By: ______________________
Randolph Gaw

Attorneys for Plaintiff
ARIONIX INC.

**<u>DEMAND FOR JURY TRIAL</u>**

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: August 4, 2026

GAW | POE LLP

By: ______________________
Randolph Gaw

Attorneys for Plaintiff
ARIONIX INC.

**VERIFICATION**

I, Deepali Sontakke, declare that I am a co-founder of plaintiff Arionix Inc. and am therefore authorized to make this verification on its behalf. I have read this **VERIFIED COMPLAINT** know their contents, and certify that the same are true of my own knowledge, and as to those things of which I do now have personal knowledge, I am informed and believe them to be true.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and this verification was executed by me on 08 / 04 / 2026 at Marpissa, Greece.

Deepali Khadakban

Deepali Sontakke



Doc ID: f501bb98dee67c5c5f6ba61971d0d0f8e4462345

Dropbox Sign

Audit trail

| | |
|---|---|
| **Title** | Verification for Complaint |
| **File name** | Sontakke_Verification.pdf |
| **Document ID** | f501bb98dee67c5c5f6ba61971d0d0f8e4462345 |
| **Audit trail date format** | MM / DD / YYYY |
| **Status** | ● Signed |

## Document History

| | | |
|---|---|---|
| SENT | **08 / 04 / 2026**<br>02:42:12 UTC | Sent for signature to Deepali Sontakke (deepali.k@precisiontechcorp.com) from rgaw@gawpoe.com<br>IP: 73.15.52.198 |
| VIEWED | **08 / 04 / 2026**<br>05:38:58 UTC | Viewed by Deepali Sontakke (deepali.k@precisiontechcorp.com)<br>IP: 195.167.26.68 |
| SIGNED | **08 / 04 / 2026**<br>05:48:41 UTC | Signed by Deepali Sontakke (deepali.k@precisiontechcorp.com)<br>IP: 195.167.26.68 |
| COMPLETED | **08 / 04 / 2026**<br>05:48:41 UTC | The document has been completed. |